# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| MARIO A. MORALES, | ) |
| Plaintiff, | ) |
| v. | ) No. 09-2350-STA-cgc |
| UNITED STATES OF AMERICA, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This is a negligence action brought against the United States of America in accordance with the Court's federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiff Mario A. Morales claims that while he was in custody of the United States Bureau of Prisons ("BOP") at the Federal Correctional Institution in Memphis, Tennessee ("FCI Memphis"), the BOP breached a duty of care by failing to protect him from another prisoner. Thus, Morales argued, the United States is liable under 18 U.S.C. § 4042 and the Federal Tort Claims Act ("FTCA"). The Court tried this civil action without a jury on August 19, 2014. Following the trial, the parties filed proposed findings of facts and conclusions of law. Federal Rule of Civil Procedure 52 requires that "[i]n an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately."[1]

---

[1] Fed. R. Civ. P. 52(a)(1).

1

**FINDINGS OF FACT**

**I. The June 8, 2006 Attack**

Plaintiff Mario Morales was in the custody of the BOP at FCI Memphis from spring 2004 to August 2006. In late 2004 or early 2005, Mr. Morales became cell mates with Mr. Ignacio Rodriguez. In December of 2005, Mr. Rodriguez was placed in the Special Housing Unit ("SHU") for possession of a knife, and Mr. Morales, who also spent time in the SHU, requested that Mr. Rodriguez be moved to another cell. Upon Mr. Morales's release into general population, he witnessed an altercation in the prison's recreation yard with Mr. Rodriguez and another inmate.[2] After the altercation, Mr. Morales, Mr. Rodriguez, and the other inmates involved were placed in SHU pending an investigation.

While in the SHU, inmates may leave their cells and go to the recreation area, or "rec cage," for one hour a day, five days a week. At the relevant time, Mr. Morales and Mr. Rodriguez were on "keep-away" status, meaning that the two inmates were to have no physical contact with each other and were not to be placed in the rec cage together. FCI Memphis policy required SHU officers to transport inmates in pairs. On the morning of June 8, 2006, SHU Officer Ann Simon escorted Mr. Morales from his cell to the rec cage alone. FCI Memphis policy also required a pat-down search and handheld-metal-detector search of inmates before they entered the rec cage. Officer Simon only performed a pat-down search of Mr. Morales. She did not check to determine if Mr. Morales and Mr. Rodriguez were in keep-away status. She then escorted and placed Mr. Rodriguez into the rec cage with Mr. Morales. It is unclear

---

[2] The Defendant proposes that Mr. Morales was identified as being "involved" in the altercation and states that another inmate identified him as an aggressor. Such facts are not relevant to the Court's decision.

2

whether Officer Simon performed a search of Mr. Rodriquez, but she did not ensure that there was an officer observing the rec cage. She then walked away.[3]

After Officer Simon left the rec area, Mr. Rodriguez attacked Mr. Morales with a 7-inch metal weapon, similar to an ice pick. Mr. Rodriguez stabbed Mr. Morales 14 times with the ice pick—in the arms, shoulders, and abdomen. Mr. Morales attempted to evade Mr. Rodriguez and feared for his life. After SHU officers finally arrived at the rec cage, they entered the area and separated Mr. Rodriguez and Mr. Morales. An investigation later determined that Mr. Rodriguez was the attacker.

## II. Treatment of Physical Injuries

SHU officers then transported Mr. Morales to the SHU Medical Triage room, where he was treated by the medical staff. Mr. Morales received six or seven wounds on his left arm, which were the most severe. A Registered Nurse cleaned the scratches and puncture wounds with soap and water, administered a tetanus shot, and indicated that follow-up in the clinic would be "as needed." The medical staff described Mr. Morales's wounds as "superficial" and "scant," and they did not run any tests to determine the depth of the punctures.

By June 12, 2006, Mr. Morales began experiencing problems opening and closing his left hand and numbness and tingling in his left arm. That day, Dr. Nahem Naimey, the senior medical officer at FCI Memphis, examined Mr. Morales and determined that the deep nerves serving muscles in Mr. Morales's left arm were intact. He later recommended that Mr. Morales receive an electromyogram ("EMG") of his left arm from a specialist in order to diagnose any

---

[3] The Plaintiff filed a Motion in Limine for an Adverse Inference with regard to a video recording of what happened in the rec cage. ECF No. 110. The video no longer exists. The Court took the Motion under advisement. The Court is the finder of fact in this case, and, after hearing all of the evidence, the Court determines that no real dispute exists as to what took place in the rec cage during the attack. Thus, the Motion is **denied as moot**.

possible nerve damage. Dr. Naimey's recommendation was forwarded to the BOP's utilization review committee, which approved the recommendation on July 20, 2006. In the meantime, a physician's assistant at FCI Memphis examined Mr. Morales on June 23 and July 19 to address his continued complaints of numbness. Notes from this meeting indicate that Mr. Morales had full range of motion in the left arm and good grip in his left hand. A physician's assistant again saw Mr. Morales on August 16.

After his last visit with the physician's assistant on August 16, Mr. Morales was transferred to the Federal Correction Institution in Edgefield, South Carolina ("FCI Edgefield").[4] Although the BOP's utilization review committee approved an EMG for Mr. Morales on July 20, 2006, Mr. Morales did not receive an EMG until March 29, 2007, at the Aiken Regional Medical Center in Aiken, South Carolina. There, Dr. Khaled Kamel performed an EMG. An EMG is composed of two parts: nerve conduction, which tests the motor nerves, and a needle test, which determines if muscles have been affected by damage to the nerve controlling the muscle. Dr. Kamel conducted the test and determined that there was "significant damage" to Mr. Morales's ulnar sensory component and ulnar digital component, which can lead to a loss of function. When asked in his deposition whether the amount of time between the injury and the EMG was too long, Dr. Kamel only responded that there were

> too many variables to answer that for certainty. . . . [A]s far as how far after the injury are you supposed to do this test, it really varies depending on a case-by-case basis . . . . But . . . I would say, you know, the sooner obviously the better just to find out what direct damage resulted, yes.[5]

---

[4] Mr. Morales also spent a brief period of time in the Federal Transfer Center in Oklahoma City.

[5] Dep. of Dr. Khlaed Kamel 16:25–17:1-13.

Mr. Morales continues to suffer from numbness and loss of feeling in his left hand, although Dr. Kamel also testified that, over time, nerve damage may heal.

**III. Treatment of Psychological Injuries**

Mr. Morales suffered psychological trauma as a result of the attack. The Defendant presented evidence that Mr. Morales had frequent contact with psychological services during the period of his incarceration before the attack. Furthermore, a test in August 2005 concluded that Mr. Morales "exaggerated negative characteristics and psychiatric symptoms in order to appear more distressed or disturbed."[6] Five days after the attack, Mr. Morales met with Chief Psychologist Stacy Spier at FCI Memphis. A psychologist then recommended that Mr. Morales read *Anxiety for Dummies*. After his transfer from FCI Memphis to FCI Edgefield, he raised concerns about his mental condition, telling the intake psychologist that he suffered from Post-Traumatic Stress Disorder.[7] He experienced nightmares, panic attacks, and trouble breathing—all brought on by sudden memories of the attack. Some clinicians with the BOP determined that Mr. Morales was not falsely presenting any information about his condition, while others believed that he was indeed exaggerating his psychological problems. At times in the months after the attacks, Mr. Morales's condition improved;[8] at other times, Mr. Morales would complain of similar psychological problems.

---

[6] Evaluation Report of Kristen Stone, M.S., Pl.'s Ex. 13.

[7] The Court does not accept Dr. De Jesus's "diagnosis" of PTSD, as she stated that she "could only testify as to [her] observations of Mr. Morales's behavior when [she] met him, and at the time he was not experiencing any symptoms of PTSD." Trial Tr. 58:24–59:9. Her "diagnosis" was based on documentation in the system from years before, and he had not received an actual diagnosis of PTSD from any psychologist.

[8] In late 2007, Dr. Jessica Seaton met three times with the Plaintiff and could not make an affirmative diagnosis. She believed that Mr. Morales was not showing signs of mental illness that merited an affirmative diagnosis.

At trial, Dr. Selma De Jesus-Zayas ("Dr. De Jesus"), the former Chief of Psychology Services at the Federal Correctional Institution in Miami, Florida ("FCI Miami") testified as to her contact with the Defendant.[9] The Court admitted Dr. De Jesus as an expert in the area of psychology and qualified Dr. De Jesus to testify as to her treatment of Mr. Morales. Dr. De Jesus testified that Mr. Morales failed to receive sufficient psychological treatment in the wake of the attack. She opined that providing literature and conducting a brief counseling session were not adequate methods of treating Mr. Morales. From her treatment of Mr. Morales at FCI Miami and experience in the profession, Dr. De Jesus testified that the anxiety, depression, and hallucinations that Mr. Morales was experiencing were consistent with symptoms associated with incidents of trauma.

## CONCLUSIONS OF LAW

### I. The Federal Tort Claims Act

As set forth in the Pretrial Order, Mr. Morales alleges that the Defendant was negligent and grossly negligent in failing to keep Mr. Morales from Mr. Rodriguez, in allowing Mr. Rodriguez to have the weapon, and in failing to care for Mr. Morales both physically and psychologically after the attack. Mr. Morales brings these claims under the Federal Tort Claims Act ("FTCA").[10] Under the FTCA, "the United States has consented, subject to certain exceptions, to suit for damages for personal injuries caused by the negligence of government employees acting within the course and scope of their employment."[11]

---

[9] Mr. Morales was transferred to FCI Miami in 2011, where he met Dr. De Jesus.

[10] 28 U.S.C. § 1346(b), 2671–2680.

[11] *Montez v. United States*, 359 F.3d 392, 395 (6th Cir. 2004) (citing 28 U.S.C. 1346(b)). There is no contention in this case that BOP employees were not "acting within the scope of [their] office[s] or employment," as required by 28 U.S.C. § 1346(b).

The Defendant filed a Motion in Limine seeking to exclude consideration of the Plaintiff's claim that the Defendant was negligent in failing to treat Mr. Morales's psychological injuries because the Plaintiff failed to exhaust his administrative remedies under the FTCA and did not plead said claim in his Complaint. Under 28 U.S.C. § 2675, a plaintiff may not bring an action against the United States "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."[12] The Court holds that the Plaintiff's administrative claim satisfied the FTCA's notice requirements. Prior to filing this lawsuit, Mr. Morales filed a "Claim for Damage, Injury, or Death" with the Administrative Office of the Courts and the Torts Branch of the United States Department of Justice's Civil Division.[13] In that claim, in a limited text box, Mr. Morales stated that he "suffered 14 stab wounds to his back, left shoulder, and left forearm. [Mr. Morales] suffered permenant [sic] nerve damage to left forearm and thumb digits on left hand. He also suffers daily psychological injury."[14] Such a description is sufficient to serve due notice on the agency that it should investigate the events that took place and the agency's remedial actions.[15] These allegations in the Plaintiff's administrative claim are consistent with those in the Plaintiff's Complaint in this action, including his allegation that the agency failed to treat the Plaintiff in the wake of the accident described. The Motion is **denied**.

---

[12] 28 U.S.C. § 2675.

[13] *See* Pl.'s Compl. 9.

[14] *Id.*

[15] *See Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 853 (10th Cir. 2005).

**II. Negligence Under the FTCA**

The FTCA allows a federal prisoner to sue for personal injury suffered as a result of a federal employee's negligence.[16] Here, the government's duty of care is set by 18 U.S.C. § 4042, which mandates that the BOP "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States . . . and provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States."[17] This duty is similar to the standard of ordinary care.[18]

In determining liability, "the elements of state tort law must be applied."[19] Neither party disputes that Tennessee law should apply to the claims. Under Tennessee law, a claim of negligence requires that the plaintiff prove five elements: "a duty of care owed by the defendant to the plaintiff; conduct falling below the applicable standard of care that amounts to a breach of that duty; an injury or loss; cause in fact; and proximate cause."[20] Mr. Morales was incarcerated at FCI Memphis, and therefore the Defendant owed him a duty of care.

---

[16] *United States v. Muniz*, 374 U.S. 150 (1963).

[17] 18 U.S.C. § 4042; *see Friedman v. United States*, No. 99-1445, 2000 U.S. App. LEXIS 15353, at * 8 (6th Cir. June 21, 2000).

[18] *See Owens v. Haas*, 601 F.2d 1242, 1249 (2d Cir. 1979); *Strachan v. United States*, No. 08-394, 2009 U.S. Dist. LEXIS 49005, at *11 (E.D. Ky. June 5, 2009).

[19] *Flechsig v. United States*, 991 F.2d 300, 303 (6th Cir. 1993) (citing *Schindler v. United States*, 661 F.2d 552, 560 (6th Cir. 1981)).

[20] *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998) (citing *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 894 (Tenn. 1996)).

**A. Failure to Provide Safekeeping**

The Defendant breached its duty of care to Mr. Morales when it allowed him to enter the recreation cage with Mr. Rodriguez. Officer Simon failed to review the keep-away status of Mr. Morales and Mr. Rodriguez before placing them in the rec cage together. She admitted in an affidavit, "I didn't review the recreation documentation to see if there were any separation concerns for inmates Morales and Rodriguez." She also stated, "I know that it was my fault concerning this incident, but at the time I was unaware Morales and Rodriguez required separation."[21] No other officers monitored the rec cage at the time, and as a result of the Defendant's failure to check the inmates' keep-away status and the Defendant's placing the inmates in the rec cage, Mr. Morales suffered 14 stab wounds. Some of the stab wounds resulted in nerve damage, continued numbness, and loss of feeling in Mr. Morales's left arm.

The Court also holds that Mr. Morales suffered psychological harm as a result of the attack. Although Mr. Morales had previous contact with psychological services and his condition seemed to improve at times, the Defendant's negligence caused at least some psychological harm. Mr. Morales testified that he had nightmares, panic attacks, trouble breathing, hallucinations, anxiety, and depression as a result of the attack. Dr. De Jesus was not present to witness Mr. Morales's symptoms shortly after the attack, but she persuasively opined at trial that the effects that Mr. Morales suffered were consistent with incidents of trauma.[22] Mr. Morales should recover damages for the harm caused by the Defendant's negligent placement of two inmates on keep-away status in the same rec cage.

---

[21] Aff. of Ann Simon, Pl.'s Ex. 25.

[22] Trial Tr. 58:9–13.

**B. Failure to Provide Treatment for Physical Injuries**

In addition to the harm that Mr. Morales suffered as a result of the attack, the Plaintiff also argued that the BOP's broad failure to treat Mr. Morales's physical and psychological injuries caused further harm. The Defendant breached its duty of care to Mr. Morales when it failed to provide Mr. Morales with access to an EMG for eight months; however, the Plaintiff did not prove that the Defendant's inaction caused any further harm. After the June 8, 2006 attack which led to Mr. Morales's arm wounds, the Chief Physician at FCI Memphis recommended that Mr. Morales have an EMG. The BOP's utilization review team approved the recommendation a month later. Nevertheless, the Defendant did not receive an EMG until March 29, 2007. The Court holds that the BOP's failure to timely treat Mr. Morales's physical injuries constitutes a breach of its duty of care to a federal inmate. Nevertheless, the Plaintiff did not prove by a preponderance of the evidence the BOP's delay in procuring an EMG for Mr. Morales caused any further injury.[23] Dr. Kamel only testified "the earlier, the better" for an EMG to determine the extent of any nerve injury, and he also testified that there were too many variables to make a determination as to whether the delay caused any injury. He testified that time was the appropriate treatment. As stated above, the Defendant is liable for its failure to keep Mr. Morales safe, and Mr. Morales should be compensated for the injuries that he incurred as a result of that failure. But the Court holds that the delay in getting an EMG did not cause any further compensable injury.

---

[23] Defendant's contention that Dr. Kamel's diagnosis of nerve injury could not connect the injury to the stabbings, however, is without merit. The Court draws the reasonable factual inference that Mr. Morales would not have suffered the nerve damage but for the attack.

**C. Psychological Treatment**

The Plaintiff introduced evidence that the BOP's broad failure to treat Mr. Morales's psychological injuries caused him additional harm.[24] The Court previously ruled that the Plaintiff was not required to file a certificate of good faith in accordance with the Tennessee Health Care Liability Act because the Plaintiff "has not alleged that any doctor treated him improperly or that the actual medical treatment he received caused him any harm. Rather, he alleges that the Government was negligent in failing to get him to the specialist he needed to see in a timely manner."[25] In making a determination on Plaintiff's "failure to provide psychological treatment," then, the Court will not analyze the adequacy or quality of treatment by psychologists who treated Mr. Morales.[26] At trial, Dr. De Jesus opined that early intervention was essential, that the treatment provided did not meet the professional standard of care, and that Mr. Morales's condition worsened as a result

. But the Plaintiff did have early contact with psychological services. Whether the actual treatment provided met the professional standard of standard of care is a claim that sounds in medical malpractice, not ordinary negligence. If the Court were to analyze the competence or adequacy of psychologists' decisions, it would allow the Plaintiff to side-step Tennessee's

---

[24] The Court previously ruled that the Plaintiff's claim for failure to provide medical care was not a claim for negligent medical care under the Tennessee Health Care Liability Act, Tenn. Code Ann. § 29-26-115 to -122. Order Denying Mot. J. on Pleadings 9–10, ECF No. 108.

[25] *Id.*

[26] The Defendant filed a Motion in Limine on this issue. *See* Def.'s Mot. in Limine with Respect to Dr. De Jesus's Testimony, ECF No. 109. To the extent that the Motion seeks to limit testimony on the adequacy or quality of mental health care actually provided by psychologists, the Motion is **granted**.

requirement of a certificate of good faith under Tennessee Code Annotated section 29-26-122.[27] Thus, the Plaintiff's only viable claim on this front is the BOP's broad, alleged failure to treat, rather than the sufficiency of actual treatment provided.

The Plaintiff received a prompt response from a psychologist after he requested to see one—just five days after the incident on June 13, 2006. At that meeting, Mr. Morales stated that he experienced some anxiety in the recreation yard, where he thought he saw blood on the floor. Mr. Morales explained that he conquered the anxiety and adequately faced the fear that day. Furthermore, his symptoms of anxiety soon abated. The psychologist commended Mr. Morales and stated that she could bring him some literature dealing with anxiety.[28] Soon thereafter, Mr. Morales received the infamous *Anxiety for Dummies*. He was also taking medication for depression-related symptoms.[29] On August 7, 2006, the Warden of FCI Memphis signed a response to Mr. Morales's original request for treatment for his left arm and for a visit from a psychologist.[30] The Warden granted the request but indicated that Mr. Morales had "been seen by the Psychologist and it was determined that [he] do[es] not require ongoing psychological counseling." In other words, the BOP met his request to see a psychologist by the time his request for an administrative remedy reached the Warden. Mr. Morales also saw Chief Psychologist Stacy Spier during "rounds" on August 4, 2006, and Spier told him that she "would

---

[27] Tenn. Code Ann. ¶ 29-26-122; *See also* Order Denying Mot. J. on Pleadings 9–10.

[28] Report of Stacy A. Spier, Pl.'s Ex. 20.

[29] Mr. Morales had also taken similar medication before the attack.

[30] Part-B Resp. to Request for Administrative Remedy, Pl.'s Ex. 22.

continue to see him on rounds, take him out of the cell for further evaluation as necessary, and to provide relevant reading materials as needed."[31]

When Mr. Morales arrived at FCI Edgefield just three months after the incident, a clinical psychologist conducted an intake screening on October 3, 2006.[32] In her report, Dr. Angela Coleman noted that Mr. Morales asked to see a psychologist, and she "advised [him] to take advantage of psychology . . . services available to him, and the means for accessing services."[33] The report indicates that a referral form about Mr. Morales's medication was sent to health services. Finally, on that date, Dr. Coleman determined that the "[n]eed for clinical intervention [was] absent." Mr. Morales later had some communication with psychological services at FCI Edgefield, and on December 28, 2007, Mr. Morales was still on medication but "report[ed] that he does not need regular contact with Psychology Services."[34] In light of these contacts with psychological services within the BOP, the Court holds that the Defendant was not broadly or systemically negligent in "failing to treat" Mr. Morales.

## III. Damages

The Defendant owed a duty to the Plaintiff to act reasonably in protecting him. It breached that duty when it allowed Mr. Rodriquez to enter the rec cage with Mr. Morales. Mr. Morales suffered physical and psychological injuries that are the direct and proximate result of the Defendant's negligence. Under the FTCA, the United States may be liable "'in the same manner and to the same extent as a private individual under like circumstances,' [but] the

---

[31] Brief Counseling Session Report, Pl.'s Ex. 22.

[32] Intake Screening of Dr. Angela Coleman, Pl.'s Ex. 19.

[33] *Id.*

[34] Report of Dr. Jessica Seaton, Pl.'s Ex. 17.

government is not liable for pre-judgment interest or for punitive damages."[35] FTCA claims "entail a two-step analysis. First, the district court applies local law to determine liability and to assess damages. Second, federal law is invoked to bar proscribed recoveries, such as punitive damages."[36]

The Plaintiff should recover damages in three categories. First, the Plaintiff should recover for the pain and suffering he experienced as a result of the attack. Second, the Plaintiff should receive damages for any injury to his left arm as a result of the attack. And third, the Plaintiff should recover for any psychological injury he experienced as a result of the attack. All of these awards are noneconomic,[37] and a Tennessee Court has correctly observed that "[d]amages for pain and suffering and for the loss of enjoyment of life are not easily quantified and do not lend themselves to easy valuation."[38] The judicial fact finder must award damages that are "within the range of reasonableness and not excessive."[39]

The first category of damages—pain and suffering as a result of the attack—are the most serious. Mr. Rodriguez testified that he was doing sit-ups in the corner of the rec cage when an officer placed Mr. Rodriguez in them same rec cage. When Mr. Morales looked up, Mr.

---

[35] *Premo v. United States*, 599 F.3d 540, 545 (6th Cir. 2010) (citing 28 U.S.C. § 2674).

[36] *Kirchgessner v. United States*, 958 F.2d 158, 159 (6th Cir. 1992).

[37] *See* Tenn. Code Ann. § 29-39-101(2) ("'Noneconomic damages' means damages, to the extent they are provided by applicable law, for: physical and emotional pain; suffering; inconvenience; physical impairment; . . . mental anguish; emotional distress; . . . noneconomic effects of disability, including loss of enjoyment of normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; and all other nonpecuniary losses of any kind or nature."). Noneconomic damages in Tennessee are limited to $750,000. *Id* § 29-39-102(a)(2).

[38] *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 210–11 (Tenn Ct. App. 2008).

[39] *Dunn v. Davis*, No. W2006-00251-COA-R3-CV, 2007 Tenn. App. LEXIS 120, at *25 (Tenn. Ct. App. Mar. 6, 2007).

Rodriguez was standing above him with the weapon. Mr. Morales was stabbed, quickly rose, started to parry the stabbings with his left arm, ran to the gate of the rec cage, and yelled for help. No officers were present. He continued blocking and kicking Mr. Rodriguez, and he attempted to evade the attack by running in circles in the rec cage. Mr. Morales was, quite justifiably, afraid for his life in those short moments. He testified, "[A]s I was running I was like . . . I'm not getting help, I'm not going to die in here, I can't die, I can't die."[40] Mr. Morales also testified that during the attack, Mr. Rodriguez uttered, "Te voy a matarte," or, "I'm going to kill you."[41] The incident lasted under a minute. Mr. Rodriguez obviously suffered substantial physical pain from the stabbings, but his sheer terror and mental anguish during and after the brief period in the cage as a result of the Defendant's negligence warrant a substantial sum. The Plaintiff is awarded $75,000 for physical and emotional pain and suffering as a result of the attack.

The second category of damages—for continued physical injury to Mr. Morales's left arm—is less significant.[42] After the attack, Mr. Rodriguez initially experienced a problem opening and closing his thumb and fingers. He also experienced tingling and numbness. As to the continuing physical effects of the attack, the most serious stab wounds affected Mr. Morales's left forearm and hand area. Dr. Khaled Kamel testified to Mr. Morales's medical condition, as he was the doctor who saw Mr. Morales for the EMG on March 29, 2007. He determined that the "ulnar sensory component was NR, non-recordable. So that indicates that

---

[40] Trial Tr. 114:21–23.

[41] *Id.* 115:12–14.

[42] The second and third category of damages could rightly be classified as "noneconomic effects of disability, including loss of enjoyment of normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; and all other nonpercuniary losses of any kind or nature." *See* Tenn. Code Ann. § 29-39-101.

there was significant damage to the sensory component of that nerve as well as the digital part of it."[43] This can lead to "primarily numbness and tingling" and loss of some feeling. Furthermore, the ulnar digital, a "smaller tributary off from the ulnar sensory," was non-recordable. Dr. Kemal stated that an "NR" reading can mean significant damage, but Mr. Morales did not testify as to any acute pain or serious loss of function. He testified that the problems with his hand

> continue[] to this day. . . . My thumb and my hand, especially in the cold weather, sometimes it will just fall asleep on me, and I'm like rubbing my fingers and my thumb, and I hold a cup or even a piece of paper in my hand, and I can't feel it on the tips of my thumb and ring finger and pinkie.[44]

Mr. Morales did not have these problems before the attack. Thus, Mr. Morales is entitled to compensatory damages for the short-term loss of closing his hand and a continued, sporadic loss of feeling in the tips of his fingers. While these damages are certainly not taken lightly by the Court, they do not represent significant loss of function or pain that seriously impairs Mr. Morales's enjoyment of life. Therefore, the Court awards the Plaintiff $5,000 for loss of physical health in his left hand.

The third category of damages recoverable is the loss of mental health that Mr. Morales suffered as a result of the attack. These damages are understandably less clear. Mr. Morales testified that after the attack he would have nightmares of the stabbing, see Mr. Rodriguez in his sleep, have panic attacks and trouble breathing, and experience hallucinations, depression, and anxiety. Dr. De Jesus confirmed that these experiences are consistent with the effects of a traumatic event such as the attack on Mr. Morales. While the consequences of the attack still manifest, by his own admission, Mr. Morales's condition has substantially improved. He

---

[43] Dep. of Dr. Khaled Kamel 11:7–11.

[44] Trial Tr. 130:24–131:6.

testified that he has been "in a much better place" since 2010, and he declined treatment at some points after the attack. Mr. Morales is entitled to compensatory damages for the mental harm he suffered and occasionally continues to suffer as a result of the Defendant's negligence. The Court awards Mr. Morales $25,000 for loss of mental health.

## CONCLUSION

The Plaintiff has established that the Defendant's negligence in placing him in a confined area with another keep-away-status prisoner caused him injury. For such injuries— including pain and suffering and loss of physical and mental health—the Court awards the sum of $105,000, as accounted for above. The Plaintiff has not established that the Defendant's delay in scheduling treatment for the Plaintiff's left arm caused any further injury, nor has he established that the Defendant broadly failed to treat his psychological injury after the attack. Thus, for these last two claims, the Plaintiff is not entitled to damages.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: December 8, 2014.